Filed 5/30/24  P. v. Aldama CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B323025 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA156576) |
| v. | |
| JIM ALDAMA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carol J. Najera, Judge.  Affirmed.

Richard B. Lennon and Peter S. Westacott, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield, Supervising Deputy Attorney General, and Seth P. McCutcheon, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant Jim Aldama (defendant) guilty of carrying a concealed dirk or dagger in violation of Penal Code section 21310 (section 21310).  In this appeal from the judgment of conviction, we consider whether the trial court correctly granted the prosecution's for-cause challenge to a prospective juror who suggested he was "definitely going to be bias[ed]" against testifying law enforcement officers.  We are also asked to decide whether section 21310 is unconstitutional in light of the United States Supreme Court's Second Amendment ruling in *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1.

## I.  BACKGROUND

The Los Angeles District Attorney charged defendant with one count of carrying a concealed dirk or dagger in violation of section 21310.  The information against defendant additionally alleged he had two prior serious or violent felony convictions.

At trial on the charge, Los Angeles County Deputy Sheriff Luis Cisneros testified he and his partner were on duty in January 2022 and saw defendant riding a bicycle that appeared to have no brakes.  The deputies stopped defendant and saw he was holding an open can of beer.  Deputy Cisneros detained defendant, and defendant told him he had two knives in one of his pockets.  Deputy Cisneros found the two knives in a sheath "completely concealed" in defendant's pocket.  The knives were over six inches long.

The jury found defendant guilty of carrying a concealed dirk or dagger.  Defendant admitted one of the prior conviction allegations, but the trial court dismissed that allegation in

furtherance of justice. The court sentenced defendant to two years in custody.

## II. DISCUSSION

Defendant advances two arguments for reversal. He contends, first, that the trial court erroneously granted the prosecution's for-cause challenge to a prospective juror who agreed he would be biased against testifying law enforcement officers but later said, after further prompting, that he could be "fair to all the witnesses." We hold there was no error because the record adequately supports the trial court's conclusion that the prospective juror expressed actual bias and was not thereafter sufficiently rehabilitated. We also reject the defense's related argument that is premised on Code of Civil Procedure section 231.7, a statute that limits exercise of peremptory challenges, not challenges for cause like the one at issue in this appeal. Defendant contends, second, that section 21310's prohibition against carrying a concealed dirk or dagger violates the Second Amendment. Assuming the constitutional right to bear "Arms" (U.S. Const., 2d Amend.) extends to a dagger, history and tradition demonstrate concealed weapon regulations like section 21310 are consistent with that constitutional right.

> A.   *Granting the Prosecution's For-Cause Challenge Was Not Error*
> 1.   *Additional background*

Prospective juror number 8456 (Juror 8456) was an unmarried man with no children who works as a "social

3

worker/counselor."[1] Defendant's trial attorney described him as a "Hispanic male."

During voir dire, the prosecution asked Juror 8456 for his reaction to the proposition that circumstantial evidence may be sufficient to find a defendant guilty of a crime. Juror 8456 responded, "I actually have a question. Are we going to have civilians testify?" The prosecution answered no and asked whether this would affect Juror 8456. Juror 8456 opined "that may actually, definitely make a lot [of] people think differently about . . . the decision making."

Asked to elaborate, Juror 8456 said, "I would assume that law enforcement is probably going to accuse [defendant] as being guilty [sic]." When the prosecution suggested law enforcement witnesses were simply "going to present facts about the situation that happened," Juror 8456 replied, "Right. I don't know if that's fair for him [i.e., defendant]." Asked to clarify, Juror 8456 explained, "I would like to have some civilians that might have seen the situation that would probably be a little bit fair for this guy I would think." The prosecution asked, "What if no civilians saw the situation?" Juror 8456 replied, "Then we would have to have very definite evidence to really make a decision."

The prosecution told Juror 8456 he had her "a little concerned" because "[i]t sound[ed] to [her] like [he was] saying because they are police officers [he] might not believe them regardless of what [he] hear[d] on the stand." Juror 8456

---

[1] At times, the reporter's transcript erroneously refers to Juror 8456 as prospective juror number 9931. Juror 8456 assumed prospective juror number 9931's seat after the latter was excused for a hardship.

4

responded, "Not necessarily. It just seems like he [i.e., defendant] doesn't have any other defense than the lady here [i.e., defense counsel]." The prosecution and the court pointed out that there was only one prosecutor, and the prosecution followed up by asking, "if I had a civilian witness or law enforcement, and both of them testified, who would you be initially without any of them testifying, more likely to believe[?]" Juror 8456 responded, "None, I haven't heard anything." The prosecution asked, "Then [w]hy does it matter if it is only law enforcement officers?" Juror 8456 explained, "I don't know. I just have a feeling they might just persecute him and find him guilty for some reason." The prosecution suggested Juror 8456 was "saying this without any evidence of that whatsoever," and the prospective juror said, "[p]ossibly yes." The prosecution asked whether Juror 8456 could "really be fair and impartial in this case," and Juror 8456 responded, "[y]es, I can."

At this point, the trial court said, "Okay. I have to interject myself. I am confused and I have to make decisions. That doesn't make sense. [¶] . . . [¶] So, if you can maybe explain it a little better. You're saying on the one hand if it is only law enforcement officer[s] that's not fair. Meaning that you don't trust law enforcement officers. You also are saying I can be fair because I will treat everybody equally. What are you saying? Everyone else is nodding." Juror 8456 responded, "I do have experience. I have friends that are part of the law enforcement. I have heard stories. They're not always the nicest."

The trial court told Juror 8456 he should have raised this earlier when the court asked whether any of the prospective jurors had friends in law enforcement. Juror 8456 apologized and elaborated, "I do have friends. Yeah, I had heard stories and

not happy [sic] about how they carry themselves in some situations." The trial court followed up by pointing out that "[o]ne of the first questions I asked everybody is have you talked to them [i.e., friends in law enforcement] about their experiences. You have, is that correct?" Juror 8456 answered in the affirmative, and the trial court then asked, "[i]s there anything about what you heard that would make you bias[ed] against one side or the other? It sounds like you are saying something here." Juror 8456 agreed, "It sounds like it." Asked to explain what he was saying, Juror 8456 responded, "Sounds like I am definitely going to be bias[ed]."

The trial court said this was a "very interesting answer. Definitely, probably going to be bias[ed]. I don't know what that means." Juror 8456 explained, "I guess I would have to hear the evidence and hear people testify to give a definite answer." The trial court said, "That's a little late though. The definite answer is I am biased and you're already sitting on the jury." Juror 8456 agreed he could "see the problem," and when asked whether he could "help [the court] with it," he responded, "How can I help you?" The trial court instructed Juror 8456 to "tell[ ] me if you can't be—you don't know where you can be right now [sic], tell me." Juror 8456 said, "I can be—I will definitely do my best and I will be fair to this individual." The trial court followed up: "Okay, you will be fair to the defense. Will you be fair to the prosecution as well?" Juror 8456 said he would. The trial court asked whether Juror 8456 could "be fair to all the witnesses that [the prosecution] calls," and he said he could. The trial court asked Juror 8456 whether he understood the reason for these questions, and he said he did.

6

The prosecution again addressed Juror 8456 and said, "It still seems a little bit to me that you might go into this with some bias. I understand you not wanting to say that but, again, we do have to know if that's going to be the case. It is okay. Everyone has their own experiences. We just need to know. We're getting a lot of back and forth. We totally understand. If you can't be fair to both sides, then just let[ ] us know okay. Do you think that's going to be an issue?" Juror 8456 responded, "It is not."

On the next court day, the trial court and counsel discussed challenges for cause. The prosecution's first challenge for cause was directed at Juror 8456.[2] The prosecution argued "[h]e made it very, very clear multiple times that he was going to look negatively on any law enforcement. In fact, he only changed his position after the court spoke to him for quite some time, and then I spoke to him again for quite some time, and then he finally just said, 'Yes, I can put it aside,' but everything he said up to that point indicated that he would absolutely not look at a police officer coming in here under the same credibility that he would give a civilian witness. In fact, he asked, 'Well, why aren't there civilian witnesses. It's unfair if there are only police officer witnesses,' so I think that does rise to the level of for cause challenge."

Defendant's attorney disputed this account. She argued Juror 8456 "was questioned . . . the same way all the jurors were questioned, which is they are being given information in a

---

[2] The prosecution's only other challenge for cause concerned a juror who spent the weekend with a relative who tested positive for COVID-19. The trial court ruled the juror was "not being released for [a] challenge for cause," but rather "for COVID safety . . . ."

7

vacuum, and his initial concern was if we are only hearing from law enforcement witnesses and no civilian witnesses that might not seem fair.  When [the prosecution] clarified what if there are only law enforcement witnesses, what if there were no civilians, then he kind of had a different perspective that there may not always be civilian witnesses, you know, before hearing about the case.  The p[ro]spective jurors have no idea if the People are choosing not to call certain witnesses or that they just didn't have those types of witnesses present, which I think [the prosecution] addressed.  [¶]  So based on all of that . . . , once he learns that would not be civilian witnesses for that reason [sic], he said he would be fair to both sides and he did clarify that is not an issue for him, so I believe he did what we can ask jurors to do . . . if they have concerns, they address it further once.  They have more information, they see if they believe they can be fair or not, and he said he would, so I don't believe there is anything that was expressed that would rise to a challenge for cause based on the fact once he received more information, understood the situation better, stated he could be fair to both sides."

The prosecution replied that, "once [Juror 8456] heard there might [not] be any civilian witnesses, he didn't immediately say then, 'Oh, okay.  Well, I can be fair and impartial.'  He actually questioned that like, 'Why aren't there any civilian witnesses.'  He didn't let off of his position that he didn't trust law enforcement and that he wouldn't give law enforcement the same, I guess, the same blank slate, you know, that he would give a civilian witness.  [¶]  He said he would probably . . . have [law enforcement officers] at a lower starting point in terms of credibility, and he made that very clear multiple times.  Once he was kind of harangued by the court and by myself, he then—yes,

8

at the last minute—said, 'Oh, well, I can be fair and impartial,' but I don't think that anything he said up to that point would lead us to believe he can actually be fair and impartial in this trial."

The trial court observed that, "[u]nder [Code of Civil Procedure section 231.7[3]] a presumed [invalid] reason for a peremptory challenge for cause [sic] is distressed[4] or negative experience with law enforcement. My concern is—and [defense counsel], you said he might not be fair, and [this] struck me because that isn't what he said. What he said is he couldn't be fair. He said he couldn't be fair because if it was—because he didn't believe law enforcement. He absolutely did not, and that just gave me pause for concern. [¶] He said some very, very disturbing things on the record. It wasn't just distress or negative experience with law enforcement. He didn't—he didn't basically say—he said if it's law enforcement witnesses, then no, that's not fair, and finally, we discussed it and discussed it and finally, he just kind of got—I feel bad because I think we just kind of browbeat him to saying, 'I will be fair,' but it was—what [the prosecution] saw, and which the court does confirm, is that—and the court is not saying this. [The prosecution] is saying it and I am confirming the fact that he clearly—his whole bearing

---

[3]     The trial court cited section 231.73, which does not exist.

[4]     As we shall discuss, Code of Civil Procedure section 231.7 refers to "distrust of or having a negative experience with law enforcement or the criminal legal system." (Code Civ. Proc., § 231.7, subd. (e)(1).) The reporter's transcript occasionally indicates the parties said "distressed" where it is likely they said "distrust."

9

and tone of voice and everything else that he presented in this courtroom, it was clear that he doesn't—the police officers clearly—and I think you saw this yourself—start lower than everyone else.  They do not start on an equal footing.  He never said they did.  He said, 'I can be fair,' which I am sure he can, but they are starting off at a lower—they are not starting off on a level playing field.  Police officers are immediately placed lower than civilian witnesses, and that the court cannot allow . . . . [¶] . . . [¶]  The court feels comfortable stating, yes, it . . . appears this is a true challenge for cause based on what he said on the record which was quite extensive, and what [the prosecution] observed and what the court concurs with, so I am going to grant that challenge for cause as to [Juror 8456]."

Defendant's attorney objected to the trial court's ruling, citing *Batson v. Kentucky* (1986) 476 U.S. 79 and arguing, among other things, that "expressing a distrust or having negative experience with law enforcement or the criminal justice system is presumptively invalid."  The trial court explained it was "making a finding that is absolutely not what this is based on.  The court even put that on record.  No.  That is not what I am saying.  He actually didn't say anything bad about law enforcement.  It was that maybe his friends had said something, and these are friends I might add.  What convinces the court is he stated right out the door that he was placing law enforcement on a lower playing [sic] than any civilian witness, so that is the court's ruling.  The court—therefore, the court finds it is not a *Batson-Wheeler*. Unless there is a better record, I don't see how it falls under *Batson-Wheeler*."

Defendant's attorney again argued Juror 8456's distrust of law enforcement was "the only basis for him being kicked.  As the

10

court stated, that is one of the bas[e]s that [is] deemed to be presumptively invalid. . . ." The trial court responded, "Okay. You keep saying that. I keep clearing up the record. I am not saying he's been kicked because of the basis that is invalid under 231.7. Race, ethnicity. It's not under that one. . . . [I]t is distressed or negative experience with law enforcement or the criminal justice system. That is not what he said in this courtroom. In fact, quite opposite. He said he's friends with police. That wasn't the basis for this granting of the challenge for cause. It is the fact he cannot put police on the same level as civilian[s]. He puts them on a lower level. That is my finding, so with that said, [Juror 8456] will be excused."

After a discussion concerning another juror, defendant's attorney asked to "make one other brief record as to [Juror 8456]." Defendant's attorney argued, "The court said I did not make a sufficient record to *Batson-Wheeler*, so I think I have to make that record. The final piece I wanted to say, your honor, is that [Juror 8456] did appear to be a Hispanic male, and on my prior record, I will submit." The trial court observed "there appears to be at least ten individuals in this court that this judge believes to be Hispanic in some way, shape or form . . . ."

The prosecution did not challenge any other jurors for cause and did not exercise any peremptory challenges.

### 2. Legal standards governing challenges for cause

Code of Civil Procedure section 225, subdivision (b)(1)(C) provides that a party may challenge a prospective juror for cause if the juror harbors "[a]ctual bias," meaning "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting

11

with entire impartiality, and without prejudice to the substantial rights of any party."

"'[W]hat constitutes "actual bias" of a juror varies according to the circumstances of the case. [Citation.] . . . "'[L]ight impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but . . . those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him [or her].""'" (*In re Manriquez* (2018) 5 Cal.5th 785, 799, quoting *People v. Nesler* (1997) 16 Cal.4th 561, 580-581 (plur. opn. of George, C. J.).)

Because "'[t]he trial court is in the best position to determine the [juror's] true state of mind . . . [having] observed firsthand [the juror's] demeanor and verbal responses,'" its ""'"determination of the person's state of mind is binding"'"" when ""'"the [juror's] statements are equivocal or conflicting. "'"" (*People v. Ramirez* (2022) 13 Cal.5th 997, 1049.) If there is no conflict or equivocation, reviewing courts must uphold the court's ruling if substantial evidence supports it. (*Ibid.*)

### 3. *Code of Civil Procedure Section 231.7*

Code of Civil Procedure section 231.7 was enacted to address "limitations" of the *Batson* procedure for rooting out unlawful discrimination in the exercise of peremptory challenges. (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943.) The statute prohibits parties in a criminal case from using "*a peremptory challenge* to remove a prospective juror on the basis of the

12

prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups."  (Code Civ. Proc., § 231.7, subd. (a), italics added.)

If a party or the court objects on Code of Civil Procedure section 231.7 grounds to a party's exercise of a peremptory challenge, "the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised." (Code Civ. Proc., § 231.7, subd. (c).)  The statute sets forth a list of presumptively invalid reasons for a peremptory challenge, including a prospective juror "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system."  (Code Civ. Proc., § 231.7, subd. (e)(1).)  If the party exercising a peremptory challenge relies on one of these presumptively invalid reasons, the party must "show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's" membership or perceived membership in a protected group. (Code Civ. Proc., § 231.7, subd. (e).)

Although Code of Civil Procedure section 231.7 does not apply to challenges for cause, the statute underscores that "[i]t is the intent of the Legislature that enactment of this section shall not, in purpose or effect, lower the standard for judging challenges for cause or expand use of challenges for cause."  (Code Civ. Proc., § 231.7, subd. (*l*).)

### 4.    *Analysis*

Defendant's challenge to the trial court's ruling on the prosecution's for-cause challenge to Juror 8456 ultimately boils down to an argument that the record does not permit a finding

13

that Juror 8456 harbored actual bias. That, however, is incorrect even if we disregard the trial court's assessment of Juror 8456's demeanor (which we shall do for purposes of our analysis).

Juror 8456 responded to a straightforward question regarding circumstantial evidence by raising his own question that implied law enforcement testimony would not be sufficient to prove guilt. When further colloquy ensued to ferret out Juror 8456's views on the matter, he initially claimed he would be no more likely to credit a civilian witness before hearing their testimony, but he responded to clarifying questions by emphasizing his disappointment in stories he heard from acquaintances in law enforcement. When the trial court expressly asked whether the stories he heard "would make [him] bias[ed] against one side or the other" and suggested "[i]t sound[ed] like [he] [was] saying something here," Juror 8456 agreed, "It sounds like it" and elaborated, "Sounds like I am definitely going to be bias[ed]."

When the trial court followed up on these remarks, Juror 8456 explained he could only give a "definite answer" regarding his bias after "hear[ing] the evidence and hear[ing] people testify." In context, this answer was not an assurance he would assess a witness's credibility based on the witness's testimony, but rather that specific testimony might overcome or cause him to re-assess his preconceived view that law enforcement officer testimony should be regarded as suspect.[5] Although Juror 8456 eventually said he could be fair to all witnesses, the trial court

---

[5]     Juror 8456's agreement that he could "see the [trial court's] problem" with the answer he gave confirms our contextual understanding.

14

was within its province to determine he had been "browbeat[en]" into the fairness concession and it did not reflect his actual state of mind.

In reaching this conclusion, we acknowledge "a juror may properly draw on her or his life experiences when determining whether a particular witness is credible." (*Manriquez*, *supra*, 5 Cal.5th 785, 812.) The fact that a prospective juror has had a negative experience with law enforcement does not necessarily mean they harbor "a general bias against law enforcement officers." (*Ibid.*) Juror 8456's statements made clear, however, that his skepticism of law enforcement testimony—though perhaps surmountable under the right circumstances—made him "definitely" biased against such witnesses as a class.

In addition to his freestanding challenge to the trial court's dismissal of Juror 8456 for cause, defendant also relies on recently enacted section 231.7 to argue "distrust of law enforcement can[not] be used as a valid basis for challenges for cause." Code of Civil Procedure section 231.7 does not, however, apply to challenges for cause. (*People v. Aranda* (2023) 95 Cal.App.5th 311, 315 ["The language of [Code of Civil Procedure] section 231.7 is clear: it applies only to peremptory challenges"].) In fact, the Legislature removed language from an early version of the bill adding section 231.7 to the Code of Civil Procedure that *did* provide it would apply to challenges for cause. (Sen. Amend. to Assem. Bill No. 3070 (2019-2020 Reg. Sess.), July 28, 2020.)

Defendant nonetheless protests the trial court's ruling impermissibly "expand[ed] [the] use of challenges for cause" in contravention of Code of Civil Procedure section 231.7, subdivision (*l*). As we have discussed, however, substantial evidence supports the trial court's finding of actual bias under

15

both Code of Civil Procedure section 225, subdivision (b)(1)(C) and longstanding case law.  Because dismissal of Juror 8456 was justified on this well-established basis, the trial court's ruling cannot be said to have expanded the grounds for accepting a challenge to a juror for cause.

> B.    *Section 21310 Does Not Run Afoul of the Second Amendment*

Section 21310 provides, subject to exceptions not applicable here, that "any person in this state who carries concealed upon the person any dirk or dagger is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of [Penal Code] Section 1170."  A dirk or dagger is "a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death."  (Pen. Code, § 16470.)  Certain folding knives qualify as dirks or daggers "only if the blade of the knife is exposed and locked into position."  (Pen. Code, § 16470.)  "A knife carried in a sheath that is worn openly suspended from the waist of the wearer is not concealed within the meaning of Section . . . 21310."  (Pen. Code, § 20200.)

Beginning with *District of Columbia v. Heller* (2008) 554 U.S. 570, the Second Amendment has been understood to "protect an individual right to keep and bear arms for self-defense" (*Bruen, supra*, 597 U.S. at 17), subject to certain exceptions.  This right applies to the states through the Due Process Clause of the Fourteenth Amendment.  (*McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742, 750.)

The high court in *Heller* held the District of Columbia's "ban on handgun possession in the home violates the Second

16

Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." (*Heller*, *supra*, 554 U.S. at 635.) Reasoning that the reference to a "well regulated Militia" in the Second Amendment's "prefatory clause" does not "limit" the operative clause and instead "announces a purpose" (*id.* at 577), the Court emphasized self-defense is "the *central component*" of the Second Amendment right (*id.* at 599).

The *Heller* Court was careful to caution, however, that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited. . . . For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. [Citations.]" (*Heller*, *supra*, 554 U.S. at 626.) The Court also recognized certain other "presumptively lawful regulatory measures," but explained its list "does not purport to be exhaustive." (*Heller*, *supra*, 554 U.S. at 627, fn. 26.)

*Heller* did not articulate an analytical framework for assessing the constitutionality of all laws regulating arms. In *Bruen*, however, the Court rejected the means-end scrutiny mode of analysis adopted by some lower courts. (*Bruen*, *supra*, 597 U.S. at 18-19.) Instead, the Court held, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's

17

'unqualified command.' [Citation.]" (*Id.* at 24.) To meet its burden, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (*Id.* at 30.)

*Bruen* involved a challenge to a New York law conditioning the grant of a license to carry a concealed handgun on a showing of proper cause, which New York courts construed to mean a demonstration of the applicant's special need for self-defense. (*Bruen*, *supra*, 597 U.S. at 12.) Under the challenged statute, a person could not carry a weapon in public (concealed or otherwise) except for a limited purpose—"such as hunting, target shooting, or employment"—unless they obtained a concealed carry permit. (*Id.* at 12.)

In holding this proper cause requirement unconstitutional, the high court in *Bruen* determined that carrying a handgun in public for self-defense falls within the plain text of the Second Amendment. (*Bruen*, *supra*, 597 U.S. at 32.) Proceeding to the second step of its analysis, the Court found no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." (*Id.* at 38.) The Court emphasized, however, that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of . . . licensing regimes [that] do not require applicants to show an atypical need for armed self-defense . . . ." (*Id.* at 38, fn. 9.) In other words, although the Court invalidated New York's proper cause requirement to obtain the concealed carry permit necessary to carry a gun in public without restriction, the Court did not invalidate all concealed carry of firearms regulations. To the

contrary, the Court distinguished between laws regulating public carry generally and concealed carry laws in particular: "The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. . . . States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." (*Id.* at 59; see also *id.* at 52 ["As we recognized in *Heller*, 'the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues'"].)

Defendant contends section 21310's prohibition against the concealed carry of a dirk or dagger is unconstitutional because there is no historical tradition of prohibiting their concealed carry. We assume dirks and daggers are Arms to which the Second Amendment applies but hold section 21310 does not infringe on Second Amendment rights as construed by the high court's recent Second Amendment jurisprudence, including *Bruen*. Indeed, both the *Heller* and *Bruen* opinions themselves acknowledge there is a historical tradition of regulating the concealed carry of weapons generally. (*Heller*, *supra*, 554 U.S. at 626 ["the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues"]; *Bruen*, *supra*, 597 U.S. at 59 ["[t]he historical evidence from antebellum America" shows "[s]tates could lawfully eliminate . . . concealed carry [of deadly weapons] . . . so long as they left open the option to carry openly"].)

Defendant, however, suggests the historical tradition of regulating carrying concealed weapons is insufficient because

19

there are too few examples of such regulations from the era in which the Second Amendment was ratified. This misunderstands the high court's jurisprudence. Although *Bruen* emphasizes that "not all history is created equal" and history after the Second Amendment's ratification may be less probative of the text's original meaning (*id.* at 34, 36-37), the high court has never held that founding-era analogues are the sine qua non of a historical tradition of arms regulation. (See *id.* at 27 ["Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation"]; *id.* at 35 ["in *Heller* we reiterated that evidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represented a 'critical tool of constitutional interpretation'"].)

But even if defendant is right that only history more contemporaneous with ratification of the Second Amendment matters, *Bruen* itself still highlights a tradition of regulating the concealed carry of weapons from both the colonial era and within a generation of the founding. For example, *Bruen* cites a New Jersey statute dating to 1686 that restricted the concealed carry of certain weapons—including, expressly, dirks and daggers. (*Bruen, supra*, 597 U.S. at 47-48 [An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881)].) *Bruen* also explains states began enacting laws regulating the concealed carry of pistols in the early 19th century. (*Bruen, supra*, at 52, fn. 16 [compiling statutes].) In addition, and beyond the discussion in *Bruen*, two 1813 statutes (within a generation of the founding) expressly prohibited the concealed carry of small,

bladed weapons like dirks and daggers. (1813 Ky. Acts at 100 [prohibiting the concealed carry of dirks and other weapons]; 1813 La. Acts at 172 [prohibiting the concealed carry of dirks, daggers, and other weapons].)

Defendant does not address these statutes. Instead, he cites various authorities purporting to show that, "[a]t the time of the Second Amendment's ratification, daggers were commonplace and, in some cases, mandatory to possess." Putting aside the fact that the authorities he cites generally refer to swords and bayonets (see, e.g., Second Militia Act of 1792, § 1, 1 Stat. 271), defendant points to nothing that contradicts the history and tradition of regulating the *concealed carry* of small, bladed weapons. And as we have already explained, there is ample jurisprudential and historical support for the proposition that prohibitions like section 21310 on the concealed carrying of weapons, including daggers, are not inconsistent with the Second Amendment.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

KIM, J.

LEE, J.[*]

---

[*] Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.